25 C.C.P.A. (Patents)

**KREBS et al. v. MELICHAREK.**

**Patent Appeals No. 3981.**

Court of Customs and Patent Appeals.
June 27, 1938.

J. F. Mothershead, of Washington, D. C. (Paul P. Stoutenburgh, of Washington, D. C., of counsel), for appellants.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal in an interference proceeding from a decision of the Board of Appeals of the United States Patent Office affirming that of the Examiner of Interferences which awarded priority of invention of the subject matter in issue to appellee, the senior party.

Appellants filed an application for a patent, serial No. 455,399, for "Multi-frequency Signaling Apparatus," on May 24, 1930. Appellee, on February 13, 1930, filed an application for a patent, serial No. 428,-072, for "Coil Selector."

An interference was declared involving the two said applications on December 6, 1933, and the appeal is before us on 7 counts of a redeclaration of interference in accordance with a decision of the Examiner of Interferences dated April 22, 1935.

Counts 1 and 5 are representative and read as follows:

"1. In a high frequency electrical system, a rotatable carrier, a multiplicity of inductance units each having different frequency characteristics disposed on said rotatable carrier, a high frequency electrical circuit terminating in fixed contacts adjacent said rotatable carrier, a variable electrical capacity in said high frequency electrical circuit, contacts carried by said rotatable carrier and connected with the inductance units thereon and adapted to establish connection with the fixed contacts adjacent said rotatable carrier, and a circuit maker and breaker including a stationary contact and a movable contact, means carried by the rotatable carrier to affect movement of the movable contact into and out of engagement with the stationary contact as the carrier is rotated for modifying the effective capacity in said high frequency electrical circuit in accordance with the value of the inductance unit which is selectively connected with said high frequency electrical circuit.

"5. Frequency changing apparatus comprising a rotatable carrier, inductance elements of different frequency characteristics mounted upon said carrier, a high frequency electrical circuit terminating in contacts adjacent said carrier, contacts connected with the inductance elements on said carrier and connectible with the aforesaid contacts when said carrier is rotated to selected positions for including a particular inductance in said high frequency elec-

trical circuit, an electrical capacity divided into two separate portions, one portion of which is permanently connected with said high frequency electrical circuit, a cam operated by the movement of said carrier for effectively connecting the several portions of said capacity in parallel in said high frequency electrical circuit when a selected inductance element is connected in said high frequency electrical circuit."

The subject matter is described by the Examiner of Interferences as follows:

"The subject matter of this interference relates to tuning apparatus for high frequency electrical circuits designed to cover a wide range of frequencies. A plurality of inductance units of selected values are mounted on a rotatable member and have their lead wires connected to a series of contact points set in the member. These contact points are adapted to be brought into contact with wiper arms connected with the proper portions of the associated electrical circuits. The apparatus includes two capacities, one of which is normally included in the high frequency electrical circuit while the second may be connected or disconnected according to the position of the rotatable member, thereby varying the value of the capacity in accordance with the particular inductance which is placed in the circuit. * * *"

In their preliminary statement, appellants allege that they conceived the invention, made the first drawings thereof, and disclosed it to others on or about August 29, 1929; that on or about September 20, 1929, they made their first written description, and reduced the invention to practice on or about October 1, 1929. Testimony was taken to support these allegations.

■ Appellee filed no preliminary statement and took no testimony and accordingly was restricted to his filing date for conception and constructive reduction to practice.

While it appears that appellee filed a brief before the Examiner of Interferences subsequent to the taking of testimony, there has been no further appearance on his behalf.

Appellants were civilian employees in the radio test shop of the United States Navy Yard, at Washington, D. C., during the year 1929. Their testimony and records amply disclose that they had conceived and communicated to others the invention covered by the counts in every particular, as alleged in their preliminary statement.

The Examiner of Interferences properly held that they are entitled to September 20, 1929, for conception of the invention in issue. The said Examiner, however, after considering their proof, held that it failed to show actual reduction to practice prior to the filing date of appellee, and that they had made no showing of diligence from a time just prior to the filing date of appellee up to the time of their own filing date.

Appellants' evidence offered in proof of reduction to practice is an actual radio set which was made in October 1929. The Examiner of Interferences said that it closely conformed to the original tracing, a copy of which is included in Exhibit 1, which tracing unquestionably discloses the elements contained in the counts.

Concerning this device as evidence of actual reduction to practice, appellants earnestly contend that it supports counts 3 and 4, and in this respect state in their brief as follows:

"* * * counts 3 and 4 define the apparatus for high frequency electrical circuits designed to cover a wide range of frequencies in which a plurality of inductance units of selected values are mounted on a rotatable member and have their lead wires connected to a series of contact points carried by the member and adapted to be brought into contact with wiper arms connected through branch circuits to a tuning condenser, and associated high frequency electrical circuits including vacuum tube amplifiers."

With respect to counts 1, 2, 5, 6, and 7, all of the remaining counts, appellants claim that they "restate the inventions of counts 3 and 4 *with the addition* of a separate capacity which is connected into the circuit together with certain of the inductances by means of a cam actuated by the rotatable member."

Appellants state that the only feature of the said radio set which differs from counts 1, 2, 5, 6, and 7 is that the exhibit contains a manually operated switch instead of a cam.

The fact that the device was successfully operated we do not think is proof that it supports any of the counts. There is nothing in the record to show that by reason of successful operation it of neces-

sity must be considered as supporting the counts. The tracing in Exhibit 1 provides for a cam, but the radio set in evidence does not have a cam. In holding that the structure in evidence does not support the counts, the Examiner of Interferences stated as follows:

"The actual radio set in which the invention is alleged to have been incorporated in October 1929 has been placed in evidence as Exhibit 5. This set includes a turntable member on which is mounted a series of inductance coils of various values. In this respect the set here conforms very closely to the showing of the original tracing, a copy of which is included in Exhibit 1. However, a wholly different means is provided for varying the capacity included in the circuit. This capacity change switch is manually operated and is located in the upper left-hand corner of the control panel, wholly independent of the inductance mounting. The set includes two variable condensers of different capacities which may be alternately included in the circuit by movement of the capacity changing switch.

"The party Melicharek has objected in his brief that the actual use of Exhibit 5 has not properly been proved. However, this becomes a moot question because on reading the counts in issue it becomes obvious that they are not supported by the structure included in Exhibit 5. Count 1 calls for:

"'* * * a circuit maker and breaker including a stationary contact and a movable contact, means *carried by the rotatable carrier to affect movement of the movable contact* into and out of engagement with the stationary contact as the carrier is rotated for modifying the effective capacity * * *.' [Italics added.]

"The remaining counts call for the same arrangement reciting the actual structure in varying degrees of detail. Counts 5 and 6 specifically recite a cam carried by the inductance support for operating the capacity switch. Clearly no one of these counts is properly supported by a structure in which the capacity changing switch is wholly independent of the inductance mounting and must always be operated manually.

"Exhibit 5 is further insufficient to support counts 3 and 5. These counts require a capacity system having branched circuits, one of which is permanently connected in the high frequency electrical circuit while the other may be cut in and out at will.

"In Exhibit 5 it appears that the capacity changing switch cuts in one or the other of the two variable condensers according to the capacity which is desired and neither condenser is permanently included in the high frequency circuit. It is believed clear from the foregoing that Exhibit 5 could not possibly constitute a reduction to practice of any of the counts in issue."

The holding of the Examiner of Interferences was concurred in by the board, and we can see nothing in the record to indicate to us that this holding is not proper. We believe, under the circumstances of this case, particularly in view of the highly technical character of the subject matter, that we should be governed by the rule in Daley v. Trube, 88 F.2d 308, 24 C.C.P.A., Patents, 964, where we said (page 312):

"It may not be amiss to suggest that our ability to understand the highly technical subject matter which appellant presents could hardly be expected, under the circumstances, to excel that of those in the Patent Office who have given it such careful and detailed consideration. The rule is well settled that, where there is a concurrence in decisions by the tribunals below, the decision appealed from will not be disturbed by the courts unless it is made clear that the same is erroneous. This rule has been made particularly applicable in cases involving highly technical matters. See Angell v. Morin, 69 F.2d 646, 21 C. C.P.A. (Patents) 1018; In re Demarest, 38 F.2d 895, 17 C.C.P.A. (Patents) 904; In re McDonald, 47 F.2d 802, 18 C.C.P.A. (Patents) 1099."

It appears that on November 6, 1929, appellants made a request through official channels in accordance with navy regulations for patent protection. On the said date the said request was forwarded by the radio officer to the engineer officer, and from him to the Commandant of the Washington Navy Yard. The aforesaid officers recommended the request be approved. On November 7, 1929, the said commandant forwarded the said request to the Bureau of Engineering of the Navy Department, recommending favorable action. On November 19, 1929, the said bureau sent the request to the office of the Judge Advocate General, where it was received November

21, 1929. Apparently there is in the last-named office a patent division, where a determination is made of the likelihood of patentability over the prior art, and the ordinary and usual work is done in preparing an application for patent.

From the time the request for patent protection reached the office of the Judge Advocate General until the time of filing, a period of about six months, the record shows no activity on the part of either appellants or their employer department, and no reason to excuse delay in filing the application. There is accordingly no evidence that the appellants or their employer were active from just prior to the time appellee entered the field, February 13, 1930, and filed his involved application. While the period of diligence is only about three and one-half months, there has not been suggested any fact from which diligence can be concluded.

It is true that the appellants were not in a position to do anything further after they had forwarded their request for patent protection. It is also true that if we should agree with their contention that the Government is not chargeable with diligence, it would follow that in similar circumstances a department of Government could indefinitely delay the filing of an application for patent in derogation of rights accruing to one who has been diligent in filing an application for patent on the same subject matter.

We are unable to see, in this case, why the same rule should not apply to the Government as applies outside of the Government. No case has been cited, nor have we been able to find a case sustaining appellants' contention in this regard. If there was any fact or circumstance here to excuse the Government for a delay of six months in merely examining the prior art and drawing and filing the application, it should have been shown in the record. This showing has not been made.

On the question of diligence the board held that—

"It is entirely possible that the period between November 6 and May 24 could have been accounted for properly, had it been shown that the Government patent department had been proceeding according to the usual routine at that time and that this application was taken up in regular order. In the absence of any proof, however, as to facts of this nature, we consider that we are not justified in making any assumption."

Both tribunals of the Patent Office considered and analyzed the evidence and concurred in awarding priority of invention to appellee. This award we consider proper.

The decision of the Board of Appeals is affirmed.

Affirmed.